```
                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF VERMONT
```

ARNOLD BRUCE ROBINSON,              :
Individually and as Parent and      :
Next Best Friend of Kelsey          :
Robinson, ARNOLD BRUCE ROBINSON,    :
as Administrator of the Estate      :
of Patricia Robinson,               :
                                    :
          Plaintiff,                :
                                    :
     v.                             :    File No. 1:09-CV-75
                                    :
SPRINGFIELD HOSPITAL, DARIN W.      :
BRADLEY, RICHARD A. MARASA,         :
and EMERGENCY SERVICES OF NEW       :
ENGLAND, INC.,                      :
                                    :
          Defendants.               :

RULING ON PLAINTIFF'S MOTION TO COMPEL AND MOTION TO AMEND
                    (Papers 40 and 44)

In the course of discovery, Plaintiff Arnold Bruce Robinson moves to compel two witnesses to answer certain deposition questions. Paper 40. Defendants Springfield Hospital, Darin W. Bradley, Richard A. Marasa, and Emergency Medical Services of New England, Inc. oppose the motion. Paper 53. Plaintiff Robinson also moves to amend his complaint. Paper 44.

I.  Background

This is a medical malpractice lawsuit arising from the death of Patricia Robinson on March 30, 2007. Based on the complaint, it appears Mrs. Robinson woke up in the middle of the night of March 29-30, 2007, with radiating pain in her left shoulder, difficulty breathing, and hot flashes. She went to the emergency

room at Springfield Hospital where physician's assistant Darin Bradley treated her.  Bradley apparently gave her a prescription for pain-killers and told her to go home.  Ms. Robinson died the next morning from a heart attack.

Plaintiff Arnold Bruce Robinson brings a variety of claims against four defendants in his personal capacity as Mrs. Robinson's husband, on behalf of the Robinsons' daughter, and as administrator of Mrs. Robinson's estate.  Against Bradley, Robinson alleges negligence for the apparent mis-diagnosis and treatment.  Against Bradley's supervisor, Dr. Richard Marasa, Robinson alleges vicarious liability based on Bradley's negligence, as well as negligent supervision.  Against Emergency Services of New England, the entity running the emergency room, Robinson alleges vicarious liability for both Bradley and Marasa's negligence.  Against Springfield Hospital, Robinson alleges vicarious liability for Bradley and Marasa's negligence, as well as negligent supervision.

## II. Motion to Compel

Robinson asks this Court to compel defendants Bradley and Marasa to answer questions about two meetings that took place after Mrs. Robinson's death.  The first meeting occurred on March 31, 2007, when Marasa called Bradley into his office to speak about Mrs. Robinson's case.  Only Marasa and Bradley were present; in the course of the discussion Marasa informed Bradley

2

that Mrs. Robinson had died. Paper 41 at 6. The second meeting was a monthly Emergency Department Physician's Assistant meeting in April 2007, attended by Marasa and most of the physician's assistants in the Emergency Department (including Bradley). The physician's assistants and Marasa discussed Mrs. Robinson's case, among other things. Paper 41 at 7-8.

At their depositions, Bradley and Marasa cited peer review privilege and refused to answer questions about the contents of these two meetings. Robinson disagrees that peer review privilege covers these conversations and now moves to compel answers from Bradley and Marasa.

Federal law governs evidentiary rulings in the federal district courts. See Fed. R. Evid. 101. In diversity cases, however, evidentiary privileges are determined by state law. Fed. R. Evid. 501. This is a diversity case, so Vermont law applies in determining the scope of the peer review privilege. Id.; Lawson v. Fisher-Price, Inc., 191 F.R.D. 381, 383 (D. Vt. 1999). Vermont established the peer review privilege by statute in 1975:

> The proceedings, reports and records of committees defined in section 1441 of this title . . . shall be confidential and privileged, and shall not be subject to discovery or introduction into evidence in any civil action against a provider of professional health services arising out of the matters which are subject to evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any findings,

3

> recommendations, evaluations, opinions, or other actions of such committees or any members thereof.

Vt. Stat. Ann. tit. 26, § 1443(a). Nearly every state, as well as the District of Columbia, has a similar privilege. See Weekoty v. United States, 30 F. Supp. 2d 1343, 1346 (D.N.M. 1998).

The peer review privilege is designed to protect the honest exchange of opinions among medical professionals for the purpose of self-improvement. To that end, states generally privilege conversations and documents that arise during the review and evaluation of medical care by a designated reviewing body. See, e.g., id.; Bredice v. Doctor's Hosp., Inc., 50 F.R.D. 249, 250 (D.D.C. 1970); Cruger v. Love, 599 So. 2d 111, 113-14 (Fla. 1992); Roach v. Springfield Clinic, 623 N.E.2d 246, 251 (Ill. 1993). By contrast, conversations and documents arising in the course of ordinary business operations are not protected. See, e.g., Lapinski v. Copley Hosp., Inc., No. 1:05-cv-34, slip op. at 16 (D. Vt. Nov. 29, 2005) (Niedermeier, Mag. J.); Ex parte Cryer, 814 So. 2d 239, 246 (Ala. 2001).

Because the dividing line between peer review and normal business operations can be unclear, courts generally apply the peer review privilege only when the formalities of a peer review process are clearly apparent. For example, conversations between a department chief and nurses will not be protected from discovery if there were no apparent peer review formalities —

4

even when the department chief views his job as "provid[ing] good quality service . . . and coordinat[ing] services between departments" and characterizes the conversations as "quality control." Roach, 623 N.E.2d at 250. Formalities such as designated committees and explicitly labeled peer-review reports act as a signal to medical employees, telling them when their opinions will be protected from discovery.[1]

Here, both meetings at issue appear to have occurred in the course of ordinary business operations. Vermont law requires physician's assistants to be supervised by doctors, see Vt. Stat. Ann. tit. 26, §§ 1731-43, including "regularly scheduled and documented discussions of cases chosen by either the [physician's assistant] or the supervising physician," Vt. Bd. of Med.

---

[1] The above principles generally explain the Vermont trial courts' application of 26 V.S.A. § 1443. See, e.g., Unsicker v. Brattleboro Retreat, No. 546-12-00 Wmcv, slip op. at 8 (Vt. Super. Ct. Nov. 15, 2002) (applying peer review privilege to documents created in the context of various formal peer review and quality assurance programs); Skowyra v. Moskalewicz, No. S963-85 CnC, slip op. at 5 (Vt. Super. Ct. Aug. 20, 1987) (basing decision to privilege documents at least partly on Vermont's peer review statute, where documents involved formal peer review interactions between a hospital and the Joint Commission on Accreditation of Hospitals). Defendants cite two Vermont trial court orders that appear to apply the peer review privilege more broadly. See Brisson v. Ne. Vt. Reg'l Hosp., No. S-93-88 CaC (Vt. Super. Ct. Mar. 26, 1991); Smejkal v. Keller, No. S1009-93 CnC (Vt. Super. Ct. June 1, 1994). However, Defendants fail to provide copies of these unpublished orders for the Court's review, and in any event, these decisions may not have been well-reasoned. See Wheeler v. Cent. Vt. Med. Ctr., Inc., 582 A.2d 165, 172 (Vt. 1989) (Dooley, J., concurring) (expressing concern that Vermont trial court "extended the reach of § 1443 far beyond its intended scope").

5

Practice Rule 7.5(c). The meeting between Bradley and Marasa after Mrs. Robinson died seems to be exactly this type of supervision. See Paper 58-3 at 4 (deposition excerpt acknowledging Marasa's supervisory duties). Similarly, the Emergency Department physician's assistants' meeting with Marasa appears to be a part of standard management practices. See Paper 53 at 3 (acknowledging Marasa's "duties as medical director of the [Emergency Department]").

Moreover, on the facts provided by both parties, there are no clear signals to indicate these meetings were a part of the peer review process. Doctor Marasa is not a part of Springfield Hospital's designated peer review system. See Paper 53 at 2-3 (describing the quality assurance program at Springfield Hospital); Paper 53-3 (same). The relevant "Quality Representative,"[2] Dr. Hamilton, was not present at either of the meetings in question.[3] Rather, Dr. Hamilton conducted a separate

---

[2] Springfield Hospital's peer review program is "multi-tiered," Paper 53 at 2, and Quality Representatives are employees charged with "talking with relevant staff members about any concerns that may arise and making a report, along with their recommendations," to the "Medical Staff Quality Officer." Paper 53-3 at 1.

[3] The initial deposition excerpts provided were unclear on who was present at the Emergency Department physician's assistant meeting, and suggested Hamilton might have been there. See Paper 41 at 7 (describing meetings with the "group of physician's assistants and Mark Hamilton"). Defendants appear to have made this mistake in their response brief. See Paper 53 at 4. Plaintiff Robinson clarifies the issue in his reply brief, though, and provides deposition excerpts confirming Dr. Hamilton

6

interview with Bradley to discuss Mrs. Robinson's case, see Paper 58-4 at 3, which confirms the meetings with Marasa were not part of Springfield Hospital's formal peer review process.

In sum, these are the types of conversations one would expect to happen in the normal course of running an emergency room, regardless of whether the hospital had a system of peer review. Therefore these meetings do not fit the principles behind peer review privilege, and the Court concludes the privilege does not apply. The Court need not address whether the statutory language in 26 V.S.A. § 1443 should be read narrowly or broadly.[4]

Defendants raise two further arguments in opposing the motion to compel. First, they urge this Court to apply a "self-critical analysis privilege" to the conversations between Bradley and Marasa. Second, they urge the Court to recognize a new privilege, using a four-part test from Wigmore's treatise on evidence. See Paper 53 at 9-12.

---

was not present at the Emergency Department physician's assistant meeting. See Paper 58 at 5-7; Paper 58-4 at 3.

[4] There is some disagreement among trial courts on this issue. Compare Unsicker, slip op. at 7 (applying peer review privilege to situations beyond "a literal reading of the statute"), and Skowyra, slip op. at 5 (applying peer review privilege broadly, based on "the spirit of the statute"), with Lapinski, slip op. at 17 (reading statute narrowly and declining to apply peer review privilege to a situation outside the explicit statutory language).

The "self-critical analysis privilege," to the extent it still exists, does not apply here. Medical peer review privilege evolved out of the broader self-critical analysis privilege, and provides a specific incarnation of that privilege for medical situations. See Weekoty, 30 F. Supp. 2d at 1345-46; Lawson, 191 F.R.D. at 385 ("[T]he self-critical analysis privilege is recognized in Vermont for medical peer review material, pursuant to statute."). Therefore the principles underlying both are the same, and to the extent peer review privilege is inapplicable, self-critical analysis privilege is also inapplicable.

This court declines to recognize a new privilege under the Wigmore test for similar reasons. Defendants offer various policy rationales for creating a new privilege, such as protecting confidentiality, encouraging voluntary exchange of opinions, and ultimately improving the quality of medical care. See Paper 53 at 9-11. But peer review privilege already exists to further the same goals, see Bredice, 50 F.R.D. at 250; Lapinski, slip op. at 14-16; Cruger, 599 So. 2d at 113-14; Roach, 623 N.E.2d at 251, so there is no need to create a new privilege. The fact that Defendants' conversations do not fit the principles of peer review privilege means they should be unprotected — not that a new privilege should be tailored to fit them.

Because these conversations are not privileged, Robinson is allowed to discover their contents. See Fed. R. Civ. P. 26(b)(1)

("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."). Accordingly, the motion to compel is granted.

III. Motion to Amend

In Paper 44, Robinson moves to amend his complaint. The main substantive changes appear to involve: (1) adding a direct (non-vicarious) claim against Emergency Services of New England for negligent supervision, and (2) adding a claim against Springfield Hospital under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd.

Generally, leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Leave to amend will be denied, however, if amending the complaint would be futile or would unduly prejudice the defendant. Foman v. Davis, 371 U.S. 178, 182 (1962); Parker v. Columbia Pictures Indus., 204 F.3d 326, 339 (2d Cir. 2000). Robinson offers no explanation in support of the proposed amendments, to indicate why the interests of justice require amendment. See Paper 44 at 1. At the same time, however, Defendants have not opposed the motion. Because Rule 15(a) codifies a liberal policy for amendments, Foman, 371 U.S. at 182, and Defendants have not provided any reasons why the

amendments would be futile or prejudicial, the motion to amend is granted. See, e.g., AIU Ins. Co. v. Mitsui O.S.K. Lines, Ltd., 897 F. Supp. 724, 726 (S.D.N.Y. 1995).

IV. Conclusion

Plaintiff Robinson's Motion to Compel (Paper 40) is GRANTED, as both conversations at issue fall outside the peer review privilege. Robinson's Motion to Amend Complaint is also GRANTED. Counsel shall file forthwith the Amended Complaint and Demand for Jury Trial.

Dated at Brattleboro, in the District of Vermont, this 5th day of February, 2010.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
Senior United States District Judge